HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RANDALL FONTANA,

                Plaintiff,

   v.

CITY OF FEDERAL WAY, et al.,

                Defendants.

CASE NO. C11-998 RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion for partial summary judgment by defendants City of Federal Way ("City" or "Federal Way"), Douglas Laird, Douglas Deyo, Brian Lauer, Thaddeus Hodge, and Debra Calhoun. Dkt. # 81-1. Specifically, defendants request that the court dismiss all claims asserted against Detective Hodge, except for a limited Fourth Amendment excessive force claim, and all the claims asserted against each of the other defendants and the City. *Id.* at 2. Plaintiff alleges two causes of action: (1) 42 U.S.C. § 1983[1] for use of excessive force, unlawful arrest, denial of

---

[1] To establish a claim under 42 U.S.C. §1983, a plaintiff must show that (1) the action occurred under color of law and (2) the action resulted in a deprivation of a constitutional right or a federal statutory right. *Paratt v. Taylor*, 451 U.S. 527, 535 (1981). Defendants concede that the individual defendants were acting under color of law. Accordingly, the court has only analyzed the second prong below.

1  medical treatment while in custody, facially invalid search warrant, judicial deception in

2  procuring a search warrant, unlawful execution of search warrant, and failure to instruct,

3  supervise, train, control or discipline officers in violation of the Fourth, Eighth and

4  Fourteenth Amendments; and (2) Outrage.[2]  Dkt. # 49.

5      Having considered the memoranda, exhibits, and the record herein, the court

6  GRANTS in part and DENIES in part defendants' motion for summary judgment.[3]

7                        **II.    BACKGROUND**[4]

8       On March 19, 2008, Federal Way homicide detectives learned that a missing

9  person, Jane Britt, was discovered dead in the trunk of her Mercedes Benz in the parking

10 lot of the Garden Terrace nursing home facility in Federal Way.  During the homicide

11 investigation, Mr. Fontana's name was mentioned by several individuals who were

12 interviewed by detectives.  Mr. Fontana's father and Ms. Britt's husband were residents

13 at the nursing home.

14     Detectives unsuccessfully attempted to speak with Mr. Fontana at his home, but

15 Mr. Fontana did not answer the door.  While approaching Mr. Fontana's home, detectives

16 used a flashlight to look into the tinted windows of a Crown Victoria in the driveway, and

17 observed various items that detectives believed could have been evidence in the homicide

18 investigation.  The items observed included a pair of shoes with the letters "SA" visible

19 _____

20     [2] Plaintiff has not pled any facts in his amended complaint regarding a Fifth Amendment

21 *Miranda* claim or a Sixth Amendment right to counsel claim.  Nor has plaintiff provided any
   argument or analysis opposing defendants' arguments to dismiss those alleged claims in his 40-

22 page opposition.  Plaintiff also has not presented any argument or analysis opposing defendants'
   arguments regarding the initial observation of the Crown Victoria or his outrage claim.

23 Accordingly, the court finds that these claims are properly dismissed for failure to oppose.  *See*
   Local Rules W.D. Wash. ("LR") 7(b)(2).

24     [3] This matter may be decided on the papers submitted.  Accordingly, the parties' request
   for oral argument is DENIED.

25     [4] There are a number of material facts in dispute.  The court has summarized the general

26 facts in the light most favorable to plaintiff.  The court has addressed the specific facts, also in
   the light most favorable to plaintiff, in detail below.

27

1   that the detectives believed could have belonged to Ms. Britt, several cameras, a bungee

2   cord with a gray hair wrapped around it, a notepad with writing on it, including license

3   plate numbers (some of which belonged to employees at the nursing home), dates, and

4   documentation indicating whether photographs had been taken, and the words "ies

5   Benzs." Based on the detectives' observations of various items in the Crown Victoria,

6   they obtained a search warrant to seize and search the car. After his vehicle was seized,

7   Mr. Fontana contacted an attorney, David Gehrke, whose office set up a meeting with the

8   Federal Way Police Department on March 25, 2008 at 4:00 p.m. Meanwhile, detectives

9   attempted to contact Mr. Fontana again on March 24, but when Mr. Fontana arrived

10  home between 9:00 and 10:00 p.m., he walked into his home, went to bed, and did not

11  answer the knock on his door.

12      Based on various interviews of Mr. Fontana's neighbors, employees of the Garden

13  Terrace, and his two brothers, and the search of the Crown Victoria, the detectives

14  obtained a search warrant for Mr. Fontana's home and cars, and the seizure of his DNA

15  and fingerprints. Detectives did not perform a background check of Mr. Fontana at any

16  time. The detectives executed the search warrant on the morning of March 25, 2008

17  when Mr. Fontana walked out of his front door to go to work. As Mr. Fontana

18  approached his truck, several cars pulled up and Detective Hodge pulled his vehicle up

19  behind Fontana's truck. Detective Hodge got out of his car, pointed a gun at Mr.

20  Fontana[5] and instructed him to get on the ground. Mr. Fontana attempted to comply with

21  the orders and informed the detective that he needed some time because of his bad back

22  and shoulders. As plaintiff attempted to move to the ground, Detective Hodge shoved his

23  foot into plaintiff's back and twisted his arms and Detective Lauer used an arm-bar

24  _____

25      [5] The court notes that Detective Hodge has testified that his gun was drawn and held in a
    low ready position down to the ground, not pointed at Mr. Fontana. Dkt. # 63 at 50 (Ex. E to
26  Miller Decl., Hodge Depo. at 62:25-63:6). Whether Detective Hodge pointed the gun directly at
    Mr. Fontana is a disputed issue of material fact.
27

ORDER- 3

1  technique to take him down.  Mr. Fontana was handcuffed, placed in a police car, and

2  transported to the temporary detention area where both of his ankles were chained to the

3  bench, and his hands were chained to the bench at various times.  Mr. Fontana remained

4  at the temporary detention facility for approximately four hours before he was released.

5  Before he was released, an unidentified officer performed another search of him and

6  yanked on his genitalia, causing him considerable pain.

7         Approximately one week later, detectives matched the DNA of an employee at the

8  nursing home to the DNA found under Ms. Britt's fingernails, and he was arrested for the

9  homicide.

10                    **III.    ANALYSIS**

11  **1. Defendants' Motion to Strike Expert Testimony**

12         Expert testimony is permitted if (1) "the expert's scientific, technical, or other

13  specialized knowledge will assist the trier of fact to understand the evidence or to

14  determine a fact in issue"; (2) "the testimony is based upon sufficient facts or data"; (3)

15  "the testimony is the product of reliable principles and methods"; and (4) "the expert has

16  reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.

17  The Ninth Circuit has generally allowed expert testimony regarding the appropriateness

18  of police conduct.  *See e.g. Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005)

19  (noting that a rational jury could rely on expert testimony regarding applicable police

20  standards and training and appropriate conduct police should have taken).  However, this

21  court must perform its gate-keeping function announced in *Daubert v. Merrell Dow*

22  *Pharms., Inc.*, 509 U.S. 579 (1993) and clarified in *Kumho Tire Co. v. Carmichael*, 526

23  U.S. 137 (1999).  This court must determine whether any and all expert testimony,

24  scientific or non-scientific, is relevant and reliable.  *See Daubert*, 509 U.S. at 589;

25  *Kumho*, 526 U.S. at 149.  Judges are given broad discretion when discharging their gate-

26  keeping functions, and need not mechanically apply the *Daubert* factors to non-scientific

27  testimony.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

1    Defendants move to strike the majority of T. Michael Nault's declaration and

2  reports on the basis of impermissible legal conclusions, improper credibility

3  determinations, and improper characterization of facts. Dkt. # 96 at 2-3. Defendants also

4  move to strike "what Mr. Nault *believes*, without any supporting data, to be accepted

5  police practices." *Id.* at 3 (emphasis in original).

6    Mr. Nault has been provided as a police practices expert.[6]  Dkt. # 95 (Nault Decl.)

7  ¶ 2. However, the court agrees with defendants that the vast majority of Mr. Nault's

8  declaration and reports provide legal conclusions, characterizations of the testimony, and

9  credibility determinations.[7]  *See* Dkt. # 95 (Nault Decl.), Exs. A, B; *Nationwide Transp.*

10 *Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("an expert witness

11 cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of

12 law.  Similarly, instructing the jury as to the applicable law is the distinct and exclusive

13 province of the court.") (emphasis in original).  As such, those portions of the declaration

14 and reports are not relevant because they will not aid the trier of fact in determining a fact

15 in issue.  Examples of proper testimony include customary police practices that are within

16 his expertise and applicable to Federal Way, the meaning of particular terms within a law

17 enforcement context, and the appropriateness of particular conduct by law enforcement.

18 Accordingly, the court has considered those portions of the declaration and reports.

19    Additionally, although Mr. Nault has described his lengthy law enforcement career

20 and work since retirement in the context of his expertise, his experience appears to

21 mostly focus on homicide investigations, confrontations with resisting or barricaded

22 individuals, overcoming armed resistance, and use of force.  Dkt. # 95-1 at 5 (Ex. A to

23 Nault Decl.).  Although Mr. Nault has characterized his general expertise in homicide

24 _____

25    [6] Defendants do not challenge Mr. Nault's qualifications as a police practices expert.

26    [7] Determining the disputed facts and weighing the credibility of witnesses is the province
   of the jury.  Additionally, the court has considered the evidence as provided by the witnesses

27 with personal knowledge.

1    investigations, nothing in Mr. Nault's general description of his expertise includes the

2    extent of expertise with respect to executing search warrants generally, or, more

3    narrowly, executing search warrants for DNA or fingerprinting.  Mr. Nault has not

4    provided the court with any basis for his opinion that the "customary and generally

5    accepted police practice, in [his] experience with such warrants, is to <u>advise</u> the person of

6    interest that you have a warrant to obtain samples of their DNA and Fingerprints. If they

7    agree, they are taken to a facility where those items can be obtained, and no 'seizure of

8    the person' becomes necessary since the subject is voluntarily complying with the Court

9    order." *Id.* at 12 (emphasis in original).  Accordingly, the court cannot determine at this

10   time whether the asserted customary and accepted police practice is sufficiently reliable.

11   **2.  Legal Standard**

12        Summary judgment is appropriate if there is no genuine dispute as to any material

13   fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

14   56(a).  The moving party bears the initial burden of demonstrating the absence of a

15   genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

16   Where the moving party will have the burden of proof at trial, it must affirmatively

17   demonstrate that no reasonable trier of fact could find other than for the moving party.

18   *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  On an issue where the

19   nonmoving party will bear the burden of proof at trial, the moving party can prevail

20   merely by pointing out to the district court that there is an absence of evidence to support

21   the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets

22   the initial burden, the opposing party must set forth specific facts showing that there is a

23   genuine issue of fact for trial in order to defeat the motion.  *Anderson v. Liberty Lobby,*

24   *Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most

25   favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

26   *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).  Additionally,

27   summary judgment should be granted sparingly in excessive force cases because the

1   excessive force inquiry often requires a jury to sift through disputed factual contentions

2   and make a credibility finding. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.

3   2005).

4   **3. Qualified Immunity**

5          The "doctrine of qualified immunity protects government officials 'from liability

6   for civil damages insofar as their conduct does not violate clearly established statutory or

7   constitutional rights of which a reasonable person would have known.'" *Mattos v.*

8   *Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson v. Callahan*, 555

9   U.S. 223, 231 (2009)). "The purpose of qualified immunity is to strike a balance between

10  the competing 'need to hold public officials accountable when they exercise power

11  irresponsibly and the need to shield officials from harassment, distraction, and liability

12  when they perform their duties reasonably.'" *Id.* Whether the officials are entitled to

13  qualified immunity depends on (1) whether the facts that the plaintiffs have alleged or

14  shown make out a constitutional violation and, (2) if so, whether the constitutional right

15  at issue was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S.

16  194, 201 (2001).[8]  No federal case directly on point is needed to establish that the conduct

17  at issue violated clearly established law. *Drummond v. City of Anaheim*, 343 F.3d 1052,

18  1062 (9th Cir. 2003). The salient question is whether at the time of the encounter, the

19  state of the law gave defendants fair warning that their alleged treatment of plaintiff was

20  unconstitutional. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007).

21         The court will address whether the individual officers are entitled to qualified

22  immunity with respect to each alleged constitutional violation below.

23

24

25

---

26         [8] The Supreme Court modified *Saucier* in *Pearson*, 555 U.S. at 236. Under *Pearson*, the
    decisional sequence is no longer mandatory. Although no longer mandatory, the court believes
27  the decisional sequence is appropriate here.

**4.  Fourth Amendment Violations**

The Fourth Amendment commands that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., Amend. IV.  The general rule is that "Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime." *Bailey v. U.S.*, 133 S.Ct. 1031, 1037 (2013) (internal quotations omitted).  In the context of determining probable cause to search, the question for a judicial officer reviewing an application for a search warrant is to decide "whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotations omitted).  Thus, a judicial officer "must examine the 'totality of the circumstances' set forth in the affidavit to determine whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Ayers*, 924 F.2d 1468, 1478 (9th Cir. 1991) (quoting *Gates*, 462 U.S. at 238).

    i.  Lack of Probable Cause on the Warrant's Face[9]

In a garden-variety claim that a warrant lacked probable cause on its face, if the arrest warrant is facially valid, the arresting officer enjoys qualified immunity unless "'the warrant application is so lacking in indicia of probable cause as to render official

---

[9] A judicial deception claim differs from a garden-variety claim that a warrant lacked probable cause on its face. *Chism v. Washington*, 661 F.3d 380, 386 n.9 (9th Cir. 2011). Accordingly, the court has analyzed these two types of claims separately.

1   belief in its existing unreasonable . . . .'"  *Smith v. Almada*, 640 F.3d 931, 937 (9th Cir.

2   2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986)).

3       Plaintiff argues that even if the information in the affidavit was true, the warrant

4   on its face did not support a finding of probable cause to search Mr. Fontana because

5   nothing connected him to Ms. Britt.  Dkt. # 87 at 30.  Plaintiff is mistaken.

6       According to the affidavit, both Ms. Britt and Mr. Fontana had a family member

7   that resided at the same nursing home.  Mr. Fontana approached Ms. Britt two years prior

8   to the murder and attempted to get her to join with him in his complaints against the

9   facility, as a result of which, she became upset and told him to leave her alone.  Dkt. #

10  90-2 at 4 (Ex. V to Fiorito Decl.).  Staff at the facility also indicated that they believed

11  that Mr. Fontana may have approached her about the same issue as recently as two weeks

12  ago.  *Id.*  The affidavit also indicated that police had recovered two gray hairs from

13  Fontana's car, and that Ms. Britt had gray hair.  *Id.* at 3. The affidavit indicated that

14  police had recovered materials from Fontana's vehicle that showed an extraordinary

15  interest in the parking lot of the nursing home and the comings and goings in the days

16  and weeks prior to the murder, including license plate numbers, photos, and dates.  *Id.* at

17  4.  The affidavit also explained the sometimes violent and irrational behavior of Fontana,

18  and indicated that the killing appeared to be disorganized and impulsive in that the

19  murder appeared to have occurred in daylight, at the end of Ms. Britt's vehicle, in a

20  visible area of the parking lot, nothing of value appeared to have been taken, and that the

21  most obvious motive appeared to be rage.  *Id.* at 3-4.  The affidavit also noted differences

22  in Fontana's mood and conduct since the killing, and noted Fontana's unwillingness to

23  speak with the police or provide DNA sample or fingerprints.  *Id.* at 4.

24      Taking the representations in the affidavit as true and considering them

25  collectively, the court cannot conclude that the warrant application is so lacking in indicia

26  of probable cause as to render official belief in its existing unreasonable.  Accordingly,

27

1 | the individual defendants are entitled to qualified immunity on the claim that the warrant
2 | lacked probable cause on its face.

3 |     ii.   <u>Judicial Deception in Procuring a Search Warrant</u> (against all individual
4 |           officers)[10]

5 |         Plaintiff contends that the officers procured the warrant through judicial deception.
6 | To prevail on a judicial deception claim, plaintiff "'must show that the defendant
7 | deliberately or recklessly made false statements or omissions that were material to the
8 | finding of probable cause.'"   *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir.
9 | 2009).   "Omissions or misstatements resulting from negligence or good faith mistakes
10 | will not invalidate an affidavit which on its face establishes probable cause." *Id.* at 1224.
11 | "Nor may a claim of judicial deception be based on an officer's erroneous assumptions
12 | about the evidence he has received." *Id.*   "If a party makes a substantial showing of
13 | deception, the court must determine the materiality of the allegedly false statements or
14 | omissions."[11] *Id.*   "If an officer submitted false statements, the court purges those
15 | statements and determines whether what is left justifies issuance of the warrant." *Id.*   "If
16 | the officer omitted facts required to prevent technically true statements in the affidavit
17 | from being misleading, the court determines whether the affidavit, once corrected and
18 | supplemented, establishes probable cause." *Id.*

19 |         *1.  Substantial Showing of Actionable Deception*

20 |         Plaintiff argues that Detective Laird's characterizations that he was a violent
21 | person who had assaulted his brother with a 2 x 4 and who the court had ordered could

22 | _____

23 |     [10] Defendants have not addressed whether all individual officers may be held liable on the
24 | judicial deception claim, as opposed to just the authors of the affidavit.  The court questions
       whether the Tenth Circuit authority cited by plaintiff is applicable to this court given plaintiff's
25 | reliance on the integral participation theory in his excessive use of force claim.  Nevertheless,
       since defendants have not met their initial burden of demonstrating an absence of genuine issue
26 | of material fact, the court has not addressed plaintiff's arguments.
       [11] "Materiality is for the court, state of mind is for the jury."  *Butler v. Elle*, 281 F.3d
27 | 1014, 1024 (9th Cir. 2002).

ORDER- 10

have no contact with his brothers at Garden Terrace were categorically false.  Dkt. # 87 at 23-24.

Detective Laird affirmatively represented to the judge that his belief was based on "facts and circumstances."  Dkt. # 90-2 at 2 (Ex. V to Fiorito Decl.).

Part of those "facts and circumstances" included the following:

> Detectives have gathered additional information about the sometimes violent and irrational behavior of Mr. Fontana.  Specifically, we have learned that an order exists against Mr. Fontana, limiting when he can have contact with his father at the nursing home.  This order was issued pursuant to issues that have arisen between Mr. Fontana and his brothers pertaining to the care of their father in the Garden Terrace Alzheimer Center of Excellence.  In addition to verbal disputes with his brothers regarding the father's care, Mr. Fontana has previously assaulted one brother in the back of the head with a 2 x 4.  Mr. Fontana's [sic] is prohibited from being at the nursing home except between the hours of 9:00 and 11:00 a.m. and between the days of the week of Monday through Saturday.  He is also prevented from being at the location while other families [sic] members are on location.

Dkt. # 90-2 at 3 (Ex. V to Fiorito Decl.).

Defendants have not presented any evidence that they received information that Mr. Fontana had previously assaulted one brother with a 2 x 4.  However, Detective Lauer received information that at least some neighbors may have witnessed Fontana strike one of his brothers with a shovel.  Dkt. # 64 at 10 (Ex. A to Lauer Decl.); Dkt. # 74 (Upchurch Decl.) ¶ 4; *see also* Dkt # 72 (Schneider Decl.) ¶ 4 (remembers telling Federal Way police officer that her daughter saw Mr. Fontana hit his brother in the head with a shovel).  There is no evidence that any eyewitnesses of the alleged assault actually provided this information to the detectives.  Nor has any detective specifically represented that any particular eyewitness reported the assault as described in the warrant.

For at least 50 years it has been settled law that a judicial officer may rely on hearsay when considering a warrant affidavit.  *Jones v. United States*, 362 U.S. 257, 271

1  (1960) ("We conclude therefore that hearsay may be the basis for a warrant."), *overruled*

2  *on other grounds by United States v. Salvucci*, 448 U.S. 83, 84 (1980); *Gates*, 462 U.S. at

3  241-42 (citing *Jones*).  The circumstances a judge may consider include an informant's

4  reliability or basis of knowledge.  *Ayers*, 924 F.2d at 1478.  Additionally, statements from

5  a citizen informant who identifies himself are "generally presumed reliable."  *Ewing*, 588

6  F.3d at 1224; *see also Gates*, 462 U.S. at 233-34 (observing that when an "honest citizen

7  comes forward with a report of criminal activity – which if fabricated would subject him

8  to criminal liability – we have found rigorous scrutiny of the basis of his knowledge

9  unnecessary").  However, the general proposition that private citizen witnesses are

10  presumed reliable does not dispense with an officer's "duty to examine further the basis

11  of the witness' knowledge or talk with any other witnesses."  *Ewing*, 588 F.3d at 1225 n.7

12  (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991)).  A court reviewing

13  a decision to issue a warrant considers only whether the judicial officer had a substantial

14  basis to believe that probable cause existed.  *Ayers*, 924 F.2d at 1478.

15        Here, Detective Laird affirmatively represented as fact to the judge that Mr.

16  Fontana had assaulted his brother with a 2 x 4.  There is no evidence that supports such

17  an assertion with respect to a 2 x 4.  Although the detectives spoke to witnesses, it

18  appears that the 2 x 4 was created out of whole cloth.   The only evidence detectives had

19  received to support such an assertion with respect to a shovel were two non-eyewitness

20  statements, only one of which identified an eyewitness as her daughter.  Detectives did

21  not speak to the daughter, contact Mr. Fontana's brothers, or perform any other

22  investigation to determine the veracity of the hearsay statements, despite the fact that

23  Detective Hodge spoke to one of the brothers the day before other detectives received

24  information about the alleged assault. Dkt. # 64 at 9-10 (Ex. A to Lauer Decl.); Dkt. # 70

25  at 5-6 (Ex. A to Hodge Decl.).  Most importantly, the affidavit does not identify the

26  witnesses or otherwise provide any information from which the judge could determine

27  the veracity and basis of knowledge of persons supplying hearsay information.  Mr.

1   Fontana maintains that he has never hit or assaulted either of his brothers (with a shovel,
2   a 2 x 4 or otherwise).  Dkt. # 94 (Fontana Decl.) ¶ 20.

3        When viewing the evidence in the light most favorable to plaintiff, the court finds
4   that plaintiff has made a "substantial showing" that a question of fact exists with respect
5   to whether detectives deliberately or recklessly made false statements in affirmatively
6   representing as fact that Mr. Fontana had previously assaulted his brother in the back of
7   the head with a 2 x 4.  This goes beyond negligence or casual omissions because
8   Detective Laird represented these statements as fact.

9        With respect to the court order, it appears that Scott Fontana informed Detective
10  Hodge that both he and his other brother, Lawrence Fontana Jr., had an order prohibiting
11  Mr. Fontana from having contact with them.  Dkt. # 70 at 6 (Ex. A to Hodge Decl.).
12  Plaintiff has not presented any evidence about the falsity of the representation.[12]
13  Accordingly, plaintiff has not made a substantial showing of falsity or reckless disregard
14  for the truth in affirmatively representing that Mr. Fontana was prevented from being at
15  the Garden Terrace while other family members were present.

16       Plaintiff also argues that the women's glove and hairs found in the search of the
17  Crown Victoria when viewed in conjunction with omitted information did not add to the
18  probable cause calculus.  Dkt. # 87 at 25.  Plaintiff argues that the omitted information
19  includes that on March 22, 2008, upon seizure of the items in the Crown Victoria,
20  detectives knew that the tennis shoes were not the kind worn by Ms. Britt, the black
21  gloves were not described as female on the inventory search, Detective Laird had no

22

23

24       [12] The order cited by plaintiff provides that Mr. Fontana was only permitted to visit his
    father between Monday and Saturday from 9:00 a.m. to 11:30 a.m., and was not permitted to
25  visit his father on Sundays "in order to allow other family members time with Mr. Fontana."
    Dkt. # 89-8 at 2 (Ex. T to Fiorito Decl.).  While this order does not prohibit Mr. Fontana from
26  coming in contact with his brothers, there is no evidence regarding whether another court order
    existed, and the court order itself indicates that there were separate visitation times for Mr.
27  Fontana and other family members.

ORDER- 13

1    training in hair detection, and none of the license plates found on the tablet corresponded

2    to Ms. Britt's Mercedes Benz.  *Id.* at 25-26.  However, the fact that the tennis shoes were

3    left out of the affidavit does not make any fact in the affidavit misleading.  Nor does the

4    fact that none of the license plates correspond to Ms. Britt's vehicle.  Indeed, the affidavit

5    explicitly states that based "on Mr. Fontana's extreme interest in the parking lot of the

6    facility, even if he did not commit the crime, it seems likely he may have captured

7    information on who did."  Dkt. # 90-2 at 4 (Ex. V to Fiorito Decl.).  Finally, plaintiff has

8    presented no evidence with respect to whether or not Detective Laird has training and

9    experience that can identify what "appear[s] to be human hairs."  *Id.* at 3.  With respect to

10   the gloves, they were logged as two black gloves, rather than women's gloves.  Dkt. # 64

11   at 17 (Ex. C to Lauer Decl.).  Additionally, Mr. Fontana asserts that there were no

12   women's gloves in the car.  Dkt. # 94 (Fontana Decl.) ¶ 23.  However, plaintiff has not

13   directed the court to any evidence that detectives had at the time to determine whether the

14   gloves were male or female.[13]  Given the information detectives had at the time, the court

15   cannot find that plaintiff has made a "substantial showing" of deception with respect to

16   whether the gloves were women's gloves.

17          Plaintiff also argues that his previous history with Ms. Britt was not portrayed

18   accurately.  Dkt. # 87 at 26.  Plaintiff argues that the conversation between him and Ms.

19   Britt occurred two years prior to her murder, and that there is no evidence that Mr.

20   Fontana approached Ms. Britt about the same issues as recently as two weeks prior to the

21   murder.  *Id.* at 26-27.  The affidavit specifically states that "[a]pproximately two years

22   ago, Mr. Fontana approached Jane Britt and attempted to get her to join with him in his

23   complaints against the facility."  Dkt. # 90-2 at 4 (Ex. V to Fiorito Decl.).  The court

24   notes that Mr. Fontana has presented evidence that challenges the statement in the

25   

26   _____

27          [13] The photograph that captured the tennis shoes does not show any gloves from which
     the court might be able to ascertain a hand size.  Dkt. # 92-5 at 2 (Ex. mm to Fiorito Decl.).

ORDER- 14

affidavit that Ms. Britt "became upset" with him.  Dkt. # 90-2 at 4 (Ex. V to Fiorito Decl.); *see* Dkt. # 94 (Fontana Decl.) ¶ 22 (Fontana "was never in a disagreement with Jane Britt at any time and she was never upset with [him]").  Additionally, detectives received information that Ms. Britt's husband had only been at the facility for a little over a year.[14]  Dkt. # 90-1 at 84 (Ex. U to Fiorito Decl. at 3008).  Detectives also received information from Coletta Schmitt that she was present when Mr. Fontana approached Ms. Britt about his issues and Ms. Britt told him to leave her alone because she did not agree. Dkt. # 83 (Schmitt Decl.) ¶ 7.  The affidavit also provides that "[s]taff at the facility also indicate they believe Mr. Fontana may have approached Mrs. Britt about the same issue as recently as two weeks ago."  Dkt. # 90-2 at 4 (Ex. V to Fiorito Decl.).  Defendants affirmatively represented these statements as fact.  However, defendants have not directed the court to any evidence that provides the factual basis for the assertion that Ms. Britt was "upset" due to her conversation with Mr. Fontana one or two years prior, or for the assertion that Mr. Fontana may have approached Ms. Britt as recently as two weeks prior to the murder, and the court has found none.

When viewing the evidence in the light most favorable to plaintiff, the court finds that plaintiff has made a "substantial showing" that a question of fact remains regarding whether detectives acted recklessly in affirmatively representing that Ms. Britt was "upset" as a result of her conversation with Mr. Fontana two years prior and that Mr. Fontana may have approached Ms. Britt as recently as two weeks prior to the murder. Both of these statements were represented as fact to the judge without any indication that detectives had received the critical information supporting such "facts."

---

[14] The court recognizes that detectives had also received information that Mr. Britt first came to the facility approximately two years prior.  Dkt. # 70 at 11 (Ex. B to Hodge Decl., Smith Statement).  However, whether the conversation between Ms. Britt and Mr. Fontana took place one year or two years earlier is not material, and Mr. Fontana does not dispute that the conversation took place.

1     Plaintiff also argues that there was no evidence that plaintiff's behavior changed

2  after Ms. Britt's body was found.  Dkt. # 87 at 27.  Specifically, plaintiff argues that there

3  was no evidence presented to the detectives that Mr. Fontana visited his father daily or

4  that he made daily complaints.  *Id.*  In reply, defendants have failed to direct the court to

5  any evidence, and the court has found none, that would suggest that Mr. Fontana made

6  daily visits or that he made daily complaints to the facility.  While there is evidence that

7  Mr. Fontana certainly visited his father and "had been filing complaints against the

8  facility for a few years and would confront employees verbally when upset[,]" (Dkt. # 71-

9  1 at 9 (Ex. A to Calhoun Decl. at 122), the court has not located any information that was

10 provided to the detectives that these visits and/or complaints occurred on a daily basis.[15]

11 Indeed, Tammy Johnson, a CNA at the facility, indicated that at some point Mr. Fontana

12 just stopped talking to the staff about five or six months prior to the murder.  Dkt. # 71-4

13 at 9 (Ex. D to Calhoun Decl. at 2694).  Additionally, defendants have not directed the

14 court to any information that detectives received at the time that Mr. Fontana made daily

15 visits and daily complaints at the facility, or that he was "uncharacteristically subdued

16 and quiet" the day after Ms. Britt's murder (Wednesday, March 19) or that afternoon

17 before the body was found, as represented in the affidavit.  Dkt. # 90-2 at 4 (Ex. V to

18 Fiorito Decl.).

19     When viewing the evidence in the light most favorable to plaintiff, the court finds

20 that plaintiff has made a "substantial showing" that a question of fact remains with

21

22     _____

23 [15] The court notes that at least one individual indicated that Mr. Fontana was "always complaining."  Dkt. # 71-4 at 9-10 (Ex. D to Calhoun Decl. at 2694-95).  However, this witness did not state, or otherwise indicate, that the complaints occurred daily.  The court also notes that

24 the information received by detectives indicates that complaints to DSHS, as opposed to critical remarks to staff, were not made on a daily basis.  Dkt. # 71-1 at 10 (Ex. A to Calhoun Decl. at

25 123 (Marty Bol, Executive Director of Garden Terrace, "said Randy has a long-standing

26 disagreement with the facility and has reported numerous complaints to DSHS about the care his father receives at the facility.  The most recent complaint was reported last week to the state

27 agency.")).

1  respect to whether detectives deliberately or recklessly made false statements in

2  affirmatively representing that Mr. Fontana made daily visits and daily complaints at the

3  facility, and whether he was uncharacteristically subdued and quiet the day after Ms.

4  Britt's murder.

5       Plaintiff also argues that the allegations that plaintiff failed to speak to police or

6  that he would not voluntarily provide evidence of his fingerprints are false. Dkt. # 87 at

7  28-29.  The affidavit represents that on the weekend after Mr. Fontana's vehicle was

8  seized, Mr. Fontana's attorney contacted the police and indicated that he would make

9  efforts to have Mr. Fontana come in to speak with them.  Dkt. # 90-2 at 4 (Ex. V to

10  Fiorito Decl.).  The affidavit represents that "[a]s of this afternoon, Mr. Fontana's

11  attorney has indicated that although he has urged Mr. Fontana to come speak to us that

12  Mr. Fontana has inexplicably failed to come in.  Additionally, Mr. Fontana's attorney

13  conveyed to us that Mr. Fontana was unwilling to provide a DNA sample or

14  fingerprints."[16]  *Id.*  However, Mr. Fontana's attorney had scheduled a meeting to meet

15  with the police on March 25, 2008 at 4:00 p.m.  Dkt. # 89-4 at 2-3 (Ex. P to Fiorito Decl.,

16  Gehrke Depo. at 18:3-21:6); Dkt. # 89-2 at 3 (Ex. N to Fiorito Decl., Fontana Depo. at

17  81:21-84:3).  Accordingly, when he heard the police knock on his door, Mr. Fontana did

18  not answer because he knew he had an appointment the next day in the afternoon.  Dkt. #

19  89-2 at 3 (Ex. N to Fiorito Decl., Fontana Depo. at 81:1-82:2).

20       When viewing this evidence in the light most favorable to plaintiff, the court finds

21  that he has made a "substantial showing" that a question of fact remains regarding

22  

23       [16] It appears that Mr. Fontana initially contacted attorney James Newton because he could
    not get in contact with David Gehrke.  Dkt. # 89-2 at 2 (Ex. N to Fiorito Decl. at 79:25-80:20).

24  Newton informed him that he would make some calls and that he should not talk to anyone
    without an attorney present.  *Id.* However, at some point, Mr. Fontana informed Newton that he

25  had contacted Gehrke's office, and that Gehrke would take care of the issue.  *Id.* at 3 (Fontana
    Depo. at 83:8-11).  The fact that Gehrke's office made an appointment for Mr. Fontana to meet

26  with the police at 4:00 p.m. on March 25, 2008, is undisputed.  *Id.* (Fontana Depo. at 82:3-84:6);

27  Dkt # 89-4 at 2 (Ex. P to Fiorito Decl., Gehrke Depo. at 18:3-20:15).

ORDER- 17

1    whether the police deliberately or recklessly made false statements in the affidavit that

2    Mr. Fontana's attorney had "urged" Fontana to speak to the police and that he had

3    "inexplicably failed to come in" and that he "was unwilling to provide a DNA sample or

4    fingerprints."

5           *2.  Materiality*

6           The court has found that plaintiff has made a substantial showing that a question

7    of fact remains with respect to whether detectives deliberately or recklessly made false

8    statements or omissions with respect to the following affirmative statements in the

9    affidavit:  (1) "Mr. Fontana has previously assaulted one brother in the back of the head

10   with a 2 X 4"; (2) Ms. Britt "became upset" and "[s]taff at the facility also indicate they

11   believe Mr. Fontana may have approached Ms. Britt about the same issue as recently as

12   two weeks ago"; (3) "[a]s of this afternoon, Mr. Fontana's attorney has indicated that

13   although he has urged Mr. Fontana to come speak to us that Mr. Fontana has inexplicably

14   failed to come in.  Additionally, Mr. Fontana's attorney conveyed to us that Mr. Fontana

15   was unwilling to provide a DNA sample or fingerprints"; and (4) "[d]uring his daily

16   visits, he would confront staff or make critical remarks about the facility and/or the staff.

17   However, beginning the day after Ms. Britt's death (she was killed on Tuesday, March

18   18th) but *before* Ms. Britt's body was found (the evening of Wednesday, March 19th), Mr.

19   Fontana's behavior at the facility was uncharacteristically subdued and quiet."  Dkt. # 90-

20   2 at 3-5 (Ex. V to Fiorito Decl.).

21          The court finds all of these statements to be material to the finding of probable

22   cause.  Whether or not Mr. Fontana hit his brother over the head with a 2 x 4 (or shovel)

23   is material to the showing of probable cause because it was the only evidence of a violent

24   act that supported the detectives' theory, as stated in the affidavit, that the "most obvious

25   motive [for the homicide] would seem to be rage."  Dkt. # 90-2 at 4 (Ex. V to Fiorito

26   Decl.); *see also* Dkt. # 89-1 at 6 (Ex. M to Fiorito Decl., Deyo Depo. at 51:25-52:16)

27

(indicating that the police would have more of a reason to look at someone who had a propensity for violence as opposed to a nonviolent person).  Whether or not Ms. Britt was "upset" as a result of the conversation that took place one to two years prior and whether they had contact two weeks prior to the murder are material because it is the only evidence connecting plaintiff and a potential motive to Ms. Britt.  The affirmative representation that Mr. Fontana's attorney urged him to speak to police and that he inexplicably failed to come in, and the omission that his attorney had actually scheduled a visit the following day are material because the detectives would not have needed a search warrant authorizing the seizure of his DNA and fingerprints if he voluntarily provided the material during his scheduled visit with the detectives.  Indeed, during this investigation, detectives obtained several voluntary, on-site DNA swabs of various individuals.  *See* Dkt. # 64 at 11 (Ex. A to Lauer Decl.).  Finally, the affirmative representations as fact that plaintiff made daily critical remarks to staff during his daily visits and that he was uncharacteristically subdued and quiet on the day after the murder are material because any uncharacteristic or irrational behavior exhibited by plaintiff would have no connection to the timing of the murder.

When stripped of these material statements that were presented to the judge as fact, the information remaining includes the following:  (1) an order exists against Fontana that limits his visitation hours with his father that arose between Fontana and his brothers regarding the care of their father at the nursing home; (2) a search of plaintiff's Crown Victoria resulted in a finding of two gray hours, women's black stretch gloves, a list of license plate numbers with dates through March 21, many of which belonged to employees of the nursing home, and Ms. Britt had gray hair; (3) Ms. Britt was murdered in the parking lot of the nursing home, the killing appeared disorganized and impulsive, nothing appeared to have been taken, and the most obvious motive would seem to be rage; (4) approximately one to two years ago, Fontana approached Ms. Britt and attempted to get her to join with him in his complaints against the facility, but Ms. Britt

1    told him to leave her alone; (5) for the past two years, Fontana has been incessantly

2    hostile toward the nursing home staff regarding the care of his father, and he frequently

3    would confront staff or make critical remarks about the facility and/or the staff during

4    those visits; (6) earlier this evening, when Mr. Fontana arrived at his house and got out of

5    his car, he ran into his house, closed the door, and would not respond to the detectives'

6    knocks on the door; (7) Fontana has not visited the nursing home since the day police

7    seized his Crown Victoria, despite having access to other transportation; and (8) on the

8    same day Ms. Britt's body was discovered, her garage door opener and wheelchair that

9    was stored in her trunk were found on the other side of the parking lot, discarded in the

10   woods, and detectives believed that it is likely the killer removed the wheel chair and

11   opener and discarded those items.  Additionally, the court supplements these facts with

12   the fact that plaintiff's attorney scheduled a meeting with the detectives for Fontana the

13   following day after he got off work.

14         The court finds that, when stripped of the material false statements and

15   supplemented by the material omission, plaintiff has made a substantial showing that the

16   search warrant for his DNA and fingerprints would not have issued, or, at a minimum,

17   that the likelihood of issuance would have been substantially jeopardized, particularly

18   where these statements were presented as facts and where no background check was ever

19   done on plaintiff.[17]

20              *3.  Qualified Immunity*

21         With respect to qualified immunity, the Ninth Circuit "effectively intertwine[s] the

22   qualified immunity question (1) whether a reasonable officer should have known that he

23   acted in violation of a plaintiff's constitutional rights with (2) the substantive recklessness

24

25   _____

26         [17] Detectives had several days to perform a background check on Fontana before drafting
     the search warrant. There is no evidence that any officer ever performed a background check on
27   Mr. Fontana.

ORDER- 20

1    or dishonesty question." *Butler*, 281 F.3d at 1024.  This merger is appropriate because

2    "no reasonable officer could believe that it is constitutional to act dishonestly or

3    recklessly with regard to the basis for probable cause in seeking a warrant." *Id.*

4    Accordingly, the detectives are not entitled to qualified immunity on summary judgment

5    with respect to the following representations of fact in the affidavit:  (1) "Mr. Fontana has

6    previously assaulted one brother in the back of the head with a 2 X 4"; (2) Ms. Britt

7    "became upset" and "[s]taff at the facility also indicate they believe Mr. Fontana may

8    have approached Ms. Britt about the same issue as recently as two weeks ago"; (3) "[a]s

9    of this afternoon, Mr. Fontana's attorney has indicated that although he has urged Mr.

10    Fontana to come speak to us that Mr. Fontana has inexplicably failed to come in.

11    Additionally, Mr. Fontana's attorney conveyed to us that Mr. Fontana was unwilling to

12    provide a DNA sample or fingerprints"; and (4) "[d]uring his daily visits, he would

13    confront staff or make critical remarks about the facility and/or the staff.  However,

14    beginning the day after Ms. Britt's death (she was killed on Tuesday, March 18th) but

15    *before* Ms. Britt's body was found (the evening of Wednesday, March 19th), Mr.

16    Fontana's behavior at the facility was uncharacteristically subdued and quiet."  Dkt. # 90-

17    2 at 3-5 (Ex. V to Fiorito Decl.).

18         iii.    <u>Unlawful Arrest (against Detectives Hodge, Lauer, and Laird)</u>

19         The general rule requires probable cause for a Fourth Amendment seizure to be

20    reasonable, even if no formal arrest is made.  *Bailey*, 133 S.Ct. at 1037; *Michigan v.*

21    *Summers*, 452 U.S. 692, 696 (1981) (citing *Dunaway v. New York*, 442 U.S. 200 (1979)

22    for general rule).  Probable cause to arrest is "knowledge or reasonably trustworthy

23    information sufficient to lead a person of reasonable caution to believe an offense has

24    been or is being committed by the person being arrested.  *Harper v. City of Los Angeles*,

25    533 F.3d 1010, 1022 (9th Cir. 2008).  Probable cause exists where "under the totality of

26    the circumstances known to the arresting officers, a prudent person would have

27

ORDER- 21

concluded that there was a fair probability that [the defendant] had committed a crime."
*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).   A fair probability is less
than "conclusive evidence of guilt[,]" but more than a "strong reason to suspect" that an
offense has been committed.   *Id.*   An arrest occurs "within the meaning of the Fourth
Amendment only if, in view of all the circumstances surrounding the incident, a
reasonable person would have believed that he was not free to leave."   *California v.
Hodari*, 499 U.S. 621, 627-28 (1991); *see also Ganwich v. Knapp*, 319 F.3d 1115, 1125
(9th Cir. 2003) (seizure becomes unlawful when it is more intrusive than necessary to
accomplish the objectives that justified the seizure in the first place) (citing *Florida v.
Royer*, 460 U.S. 491, 504 (1983).

Within the framework of the general rules, "there is some latitude for police to
detain where the intrusion on the citizen's privacy was so much less severe than that
involved in a traditional arrest that the opposing interests in crime prevention and
detection and in the police officer's safety could support the seizure as reasonable."
*Bailey*, 133 S.Ct. at 1037 (internal quotations omitted).   For instance, *Summers*
recognized that a rule permitting the detention of occupants on the premises during the
execution of a search warrant for contraband, even absent individualized suspicion, was
reasonable and necessary in light of the law enforcement interests of officer safety,
facilitating the completion of the search, and preventing flight and the limited intrusion
on personal liberty.   452 U.S. at 702-03; *Bailey*, 133 S.Ct. at 1041-42.   The *Summers*
Court also noted, however, that although "special circumstances, or possibly a prolonged
detention, might lead to a different conclusion in an unusual case, [it is] persuaded that
this routine detention of residents of a house while it was being searched for contraband
pursuant to a valid warrant is not such a case."   452 U.S. at 706 n.21.   "Because this
exception grants substantial authority to police officers to detain outside of the traditional
rules of the Fourth Amendment," the Supreme Court recently imposed a spatial constraint
defined by the immediate vicinity of the premises to be searched for detentions incident

1    to the execution of the search warrant. *Bailey*, 133 S.Ct. at 1042. "Detentions incident to

2    the execution of a search warrant are reasonable under the Fourth Amendment because

3    the limited intrusion on personal liberty is outweighed by the special law enforcement

4    interests at stake." *Id.* at 1042-43.

5         Another exception to the general rule that the Supreme Court has recognized is a

6    seizure "for the purpose of fingerprinting, if there is reasonable suspicion that the suspect

7    has committed a criminal act, if there is a reasonable basis for believing that

8    fingerprinting will establish or negate the suspect's connection with that crime, and if the

9    procedure is carried out with dispatch." *Hayes v. Florida*, 470 U.S. 811, 817 (1985).

10   The *Hayes* Court also opined that "under circumscribed procedures, the Fourth

11   Amendment might permit the judiciary to authorize the seizure of a person on less than

12   probable cause and his removal to the police station for the purpose of fingerprinting."

13   *Id.*

14        Here, it is undisputed that defendants did not have probable cause to arrest Mr.

15   Fontana and that he was not a suspect, but rather, a person of interest in a homicide

16   investigation.  It is also undisputed that defendants did not have an arrest warrant.

17   Rather, the search warrant authorized the search of Mr. Fontana and the seizure of his

18   DNA and fingerprints, as well as the search of his home and cars.  Dkt. # 90-2 at 6-7 (Ex.

19   V to Fiorito Decl.) (commanding officer to "Search" "Fontana, Randall Lee," residence

20   and vehicles, and "Seize" "DNA and fingerprints from Randy Fontana and other

21   evidence of the above stated crime(s).").

22        Additionally, Mr. Fontana's attorney had previously made arrangements with the

23   police to speak with them the same day the warrant was executed.  Dkt. # 89-4 at 2-3 (Ex.

24   P to Fiorito Decl., Gehrke Depo. at 18:3-21:6); Dkt. # 89-2 at 3 (Ex. N to Fiorito Decl.,

25   Fontana Depo. at 81:21-84:3).  Nevertheless, as Mr. Fontana approached his driver's side

26   door of his truck, several cars pulled up and Detective Hodge pulled his vehicle up

27   behind Fontana's truck. Dkt. # 89-2 at 4 (Ex. N to Fiorito Decl., Fontana Depo. at 88:22-

89:23); Dkt. # 94 (Fontana Decl.) ¶¶ 10-12.  Detective Hodge got out of his car, pointed a gun at Mr. Fontana and told him to go to the ground.  *Id.*  There is no evidence that Mr. Fontana presented a danger to officer safety.  He was not armed, he did not make any threatening gestures, did not resist, did not attempt to flee, and he attempted to comply with the orders when officers took him to the ground.[18]  Dkt. # 88-8 at 19 (Ex. H to Fiorito Decl., Laird Depo. at 147:12-20); Dkt. # 94 (Fontana Decl.) ¶¶ 10-12.  The only resistance demonstrated was plaintiff's request to get down to the ground slow due to injuries to his back.

Furthermore, it is undisputed that Mr. Fontana was handcuffed, placed in a police car, and transported to the temporary detention area where both of his ankles were chained to the bench, and his hands were chained to the bench at various times.  Dkt. # 63 at 46 (Ex. D to Miller Decl., Laird Depo. at 81:21-83:8 (general procedures)); Dkt. # 89-1 at 12 (Ex. M to Fiorito Decl., Deyo Depo. at 101:21-103:12); Dkt. # 89-2 at 6-8 (Ex. N to Fiorito, Fontana Depo. at  95:25-96:10, 99:16-18, 101:8-14, 102:7-103:6); Dkt. # 94 (Fontana Decl.) ¶¶ 14-15.  Mr. Fontana asserts that he was at the detention area for approximately four hours before he was released, and informed officers that his right shoulder hurt.[19]  Dkt. # 94 (Fontana Decl.) ¶¶ 15-16.  Detective Hodge has testified that

---

[18] The court recognizes that Detective Hodge has testified that Mr. Fontana did not comply with orders and kept walking when told to stop.  Dkt. # 88-6 at 7 (Ex. F to Fiorito Decl., Hodge Depo. at 62:3-64:13); *see also* Dkt. # 63 at 50 (Ex. E to Miller Decl., Hodge Depo. at 62:25-63:6) (gun held at low ready, not pointed directly at Fontana).  However, the court must view the facts in the light most favorable to plaintiff on summary judgment.

[19] Defendants have moved to strike plaintiff's assertion that he was detained for approximately four hours because it "contradicts his deposition testimony, in which he states he cannot estimate how long he was detained at the Federal Way Police Department."  Dkt. # 96 at 2 (citing to Fontana Depo. at 107:5-20).  Contrary to defendants' representation, Mr. Fontana responded no to whether he could estimate how long "the process" took.  Dkt. # 89-2 at 9 (Ex. N to Fiorito Decl., Fontana Depo. at 107:19-20).  However, the "process" referred to appears to be officers taking pictures and swabs, and not the entire length of his detention.  *Id.* (107:5-20).  His later recollection that he was at the detention center for a total of approximately four hours is not contradictory.  Accordingly, defendants' motion to strike his testimony that he was detained for approximately four hours is DENIED.

1    the process for taking fingerprints and DNA would take ten minutes at the most, and that

2    he could take a DNA swab in the field. Dkt. # 88-6 at 2, 12 (Ex. F to Fiorito Decl.,

3    Hodge Depo. at 36:10-12, 101:8-23). Additionally, defendants have not presented any

4    evidence with respect to why Mr. Fontana was kept at the station for approximately four

5    hours, when the entire process should have taken ten minutes.

6        When viewing the totality of the circumstances in the light most favorable to

7    plaintiff, the court cannot conclude that the facts in this case fall within the limited

8    exceptions recognized in *Summers* and *Hayes*. Rather, the totality of the circumstances

9    more accurately resemble an arrest from which a reasonable person in plaintiff's position

10   would believe that he was not free to leave.[20] Accordingly, plaintiff has made out a

11   Fourth Amendment violation.

12        With respect to qualified immunity, it has long been established that a warrantless

13   arrest is justified only where there is probable cause to believe that a criminal offense has

14   been committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). It has also been clearly

15   established that detaining a person in handcuffs during the execution of a warrant to

16   search for evidence is permissible, but only when justified by the totality of the

17   circumstances. *Meredith v. Erath*, 342 F.3d 1057, 1062-63 (9th Cir. 2003). Additionally,

18   the officers should have known that a seizure becomes unlawful when it is more intrusive

19   than necessary to accomplish the objectives that justified the seizure in the first place.

20   *Ganwich*, 319 F.3d at 1125. A reasonable officer would have known that handcuffing a

21   person of interest, transporting him to the station, shackling him to a bench at the station

---

24      [20] The court does not mean to imply that a search warrant for DNA and fingerprints never carries with it the ability of the police to transport the individual to the police station for the limited purpose of obtaining DNA and fingerprints for a reasonable time. Indeed, such a conclusion would appear to be contrary to *Hayes* which permits transport to the police station on less than probable cause for purposes of fingerprinting under certain circumstances. However, the court does not believe those circumstances are present here given the manner the warrant was executed and the length of time he was shackled at the detention center.

for approximately four hours all to execute a search warrant for his DNA and fingerprints that would only take ten minutes to finish and when he was already scheduled to voluntarily appear ten hours later violated Mr. Fontana's Fourth Amendment right to be free from an unreasonable seizure.  There is nothing to suggest that the officers engaged in any effort to "carefully tailor" their conduct to the circumstances before them.  *See Ganwich*, 319 F.3d at 1122 ("The scope of a detention 'must be carefully tailored to its underlying justification.'").

Accordingly, Detectives Hodge, Lauer, and Laird are not entitled to qualified immunity.

iv.  Unlawful Execution of Search Warrant (against Detectives Hodge, Lauer, Laird and Deyo)

"The Fourth Amendment proscribes only 'unreasonable' searches and seizures." *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994).  The reasonableness of the search and seizure depends on both when it is made and how it is carried out.  *Id.* "Whether an otherwise valid search or seizure was carried out in an unreasonable manner is determined under an objective test, on the basis of the facts and circumstances confronting the officers."  *Id.*  The court may "look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*, and then must consider 'whether the *totality* of the circumstances justifies a particular sort of seizure.'" *Id.* at 876 (emphasis in original).[21]  "A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy."  *Id.*

_____

[21] In *Graham v. Connor*, 490 U.S. 386, 396 (1989), the Court stated that determining the reasonableness of a seizure requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

1       Here, the search warrant authorized the search of Mr. Fontana, his home and his

2 cars, and the seizure of his DNA and fingerprints, and other evidence relating to the

3 homicide crime.  The court believes that in order to seize DNA and fingerprints, some

4 form of detention for a reasonable time was appropriate.  Although the search warrant

5 was obtained in connection with a murder investigation, Mr. Fontana was not a suspect.

6 The court acknowledges that murder is a severe crime.  However, there is no evidence

7 that he posed an immediate threat to the safety of the officers or others.  There is no

8 evidence that any detective performed a background check on Fontana.  The court

9 acknowledges that he did not answer the door when police attempted to speak to him the

10 night before.  However, detective Lauer has acknowledged that Fontana was under no

11 obligation to speak with the officers at that time.  Dkt. # 88-11 at 8 (Ex. K to Fiorito

12 Decl., Lauer Depo. at 57:19-58:5).  When police executed the search warrant, Mr.

13 Fontana, by his account, did not actively resist or attempt to evade by flight.

14 Additionally, his attorney had previously scheduled an appointment for the afternoon on

15 which the warrant was executed to voluntarily meet with detectives.

16       When viewing the totality of the circumstances in the light most favorable to

17 plaintiff, a reasonable jury could find that ordering Mr. Fontana to the ground at gun

18 point, handcuffing him, transporting him to the station, and shackling him to a bench for

19 approximately four hours was an objectively unreasonable manner of executing the

20 search warrant for his fingerprints and DNA.

21       As indicated above, it has long been established that detaining a person in

22 handcuffs during the execution of a warrant to search for evidence is permissible, but

23 only when justified by the totality of the circumstances.  *Meredith*, 342 F.3d at 1062-63.

24 Additionally, it has also long been established that prolonged detention in connection

25 with a search warrant may be unreasonable.  *Franklin*, 31 F.3d at 876.  Based on the facts

26 presented by plaintiff, a reasonable officer would have known that handcuffing Mr.

27 Fontana, transporting him to the station, shackling him to a bench, and keeping him there

1  for approximately four hours in executing a search warrant for his fingerprints and DNA

2  that should have taken less than ten minutes was unlawful.

3        v.   Excessive Use of Force (against Detectives Hodge, Laird, Lauer and Doe

4             Officers)

5        A Fourth Amendment excessive use of force claim is analyzed under the

6  framework outlined in *Graham v. Connor*, 490 U.S. 386 (1989).  The court must

7  determine whether the force used was objectively reasonable under the circumstances by

8  balancing the nature and quality of intrusion on a person's liberty with the countervailing

9  governmental interests at stake.  *Graham*, 490 U.S. at 396.  The Ninth Circuit applies

10 *Graham* by first considering the nature and quality of the alleged intrusion.  *Mattos*, 661

11 F.3d at 441.  The court then considers the governmental interests at stake by looking at

12 (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to

13 the safety of officers or others, and (3) whether the suspect was actively resisting arrest or

14 attempting to evade arrest by flight.  *Id.*  However, these factors are not exhaustive.  *Id.*

15 The court must examine the totality of the circumstances and consider whatever specific

16 factors may be appropriate in a particular case.  *Id.*  "Ultimately, the most important

17 *Graham* factor is whether the suspect posed an immediate threat to the safety of the

18 officers or others."  *Id.* (internal quotations omitted).

19       Defendants argue that the court should rule as a matter of law (without citation to

20 relevant Ninth Circuit or Supreme Court authority) that the action of a police officer in

21 pointing a gun at a person and of placing Mr. Fontana in handcuffs cannot be the basis for

22 a Fourth Amendment claim.  Dkt. # 81-1 (Mot.) at 29.  However, the Ninth Circuit has

23 ruled to the contrary under certain circumstances.  *See Cameron v. Craig*, 713 F.3d 1012,

24 1022 (9th Cir. 2013) (summarizing and citing as examples, *Robinson v. Solano Cnty.*, 278

25 F.3d 1007, 1013-15 (9th Cir. 2002) (en banc) (aiming weapons at a suspect may, in

26 certain circumstances, constitute excessive force), *Baldwin v. Placer Cnty.*, 418 F.3d 966,

27 970 (9th Cir. 2005) (pointing weapons and pushing plaintiff could constitute excessive

1    force), and *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (tight

2    handcuffing can constitute excessive force)).

3         Here, Detective Hodge pointed a gun directly at plaintiff[22] and instructed him to

4    get on the ground.  Dkt. # 94 (Fontana Decl.) ¶ 11; Dkt. # 89-2 at 4-5 (Ex. N to Fiorito

5    Decl., Fontana Depo. at 88:22-89:23, 91:6-16).  Plaintiff complied and informed the

6    detective that he needed some time because of his bad back and shoulders.  *Id.*  As

7    plaintiff attempted to move to the ground, Detective Hodge shoved his foot into

8    plaintiff's back and twisted his arms and Detective Lauer used an arm-bar technique to

9    take him down.  Dkt. # 88-6 at 13 (Ex. F to Fiorito Decl., Hodge Depo. at 116:18-25);

10   Dkt. # 88-11 at 12 (Ex. K to Fiorito Decl., Lauer Depo. at 75:10-18); Dkt. # 89-2 at 5-6

11   (Ex. N to Fiorito Decl. at 92:24-94:2).  The court recognizes that the detectives were

12   investigating a serious homicide and plaintiff was a person of interest.  Dkt. # 88-8 at 39

13   (Ex. H to Fiorito Decl., Laird Depo. at 39:5-40:6).  However, there is no evidence that

14   plaintiff presented a safety risk to the detectives that morning.  He was not armed.  He

15   made no threatening gestures.  He did not attempt to flee, but rather "froze" upon seeing

16   the cars drive up.  Dkt. # 94 (Fontana Decl.) ¶ 11.  When Detective Hodge ordered him to

17   put his hands up and get down on the ground, he complied by turning to his right and

18   starting to get down.  *Id.* ¶ 12.  Although they had a search warrant to obtain DNA and

19   fingerprints from plaintiff, and to search his home and cars, they did not have an arrest

20   warrant and he was not a suspect in the homicide.  Plaintiff even had an appointment to

21   go to the police station at 4:00 p.m. that day with his attorney.

22        Viewing the totality of the circumstances and the evidence in the light most

23   favorable to plaintiff, a reasonable jury could find that the amount of force used against

24   Mr. Fontana was constitutionally excessive under these circumstances.

25

26   _____

27        [22] *See* fn 5, *supra*.

1    Plaintiff also argues that Detectives Laird and Lauer should be held liable under

2    the integral participation theory, and that unidentified officers at the Federal Way Police

3    Station used excessive force by grabbing plaintiff's genitalia and yanking hard.  Dkt. # 87

4    at 13-17.  Defendants argue in reply that there is no evidence demonstrating that "Lauer

5    or Laird participated in the alleged foot to the back and arm-twisting during handcuffing"

6    and that Lauer's use of an arm-bar was constitutionally permissive as a trained defensive

7    tactic.  Defendants offer no response to plaintiff's second argument regarding the

8    unidentified officers.[23]

9    The Ninth Circuit has adopted the "integral participation" theory of liability where

10   an officer who is an integral participant may be held liable for the Fourth Amendment

11   violation by another officer.[24]  *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996).

12   "Specifically, 'integral participation' does not require that each officer's actions

13   themselves rise to the level of a constitutional violation."  *Boyd*, 374 F.3d at 780.  The

14   Ninth Circuit, citing the Fifth Circuit approvingly, has found that officers are integral

15

16   _____

17   [23] Although Defendants have not moved for summary judgment on the excessive force
     claim against a John Doe defendant for yanking on his genitals at the detention center, the court

18   notes that it is unclear as to how plaintiff intends to proceed against a John Doe defendant where
     the deadlines for discovery and adding additional parties has long passed.  Nor has plaintiff

19   identified any legal authority or municipal policy under which municipal liability would be
     appropriate for the actions of the unidentified officer.  Nevertheless, since defendants have not

20   moved to dismiss the excessive force claim that occurred at the detention center, these claims
     remain.

21   [24] The court is concerned about counsel for defendants' representations regarding certain

22   case law.  At best, counsel has simply misstated relevant holdings and propositions.  For
     example, in reply, defendants argue that the *Chuman* court "rejected the law established by the

23   Fifth Circuit's holding in *James ex. rel. James v. Sadler*, 909 F.2d 834 (5th Cir. 1990)."  Dkt. #
     96 at 6.  Defendants also argue that a plaintiff must establish "individual participation in the

24   unlawful conduct."  *Id.*  However, *Chuman* did not reject the Fifth Circuit's integral participation
     theory, but, rather, rejected the jury instruction that used the term "team effort" which was

25   created by the district court and not found anywhere in the Fifth Circuit decision.  Indeed, the
     Ninth Circuit has expressly adopted the Fifth Circuit's "integral participation" theory of liability

26   that does not require personal involvement in the constitutional violation.  *Boyd v. Benton
     County*, 374 F.3d 773, 780 (9th Cir. 2004).

27

1   participants where they stood armed behind the officer who deployed the flash-bang, the

2   use of the flash-bang was part of the search operation in which every officer participated

3   in some meaningful way, and every officer was aware of the decision to use the flash-

4   bang, did not object to it, and participated in the search operation knowing the flash-bang

5   was to be deployed.  *Id.* (citing *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir.

6   1990) and *Melear v. Spears*, 862 F.2d 1117, 1186 (5th Cir. 1989)).

7          Here, Detectives Hodge, Lauer and Laird were actively involved in investigating

8   the homicide and providing relevant information for the search warrant.  On March 24,

9   2008, Laird authored the search warrants following a discussion between Detectives

10  Lauer, Hodge, Laird and others regarding information gathered with respect to plaintiff.

11  Dkt. # 67 at 9, 21, 26 (Exs. A at 00177, C, D to Laird Decl.); Dkt. # 88-8 at 6 (Ex. H to

12  Fiorito Decl., Laird Depo., 58:10-59:4).  A judge authorized the search warrant to obtain

13  DNA and fingerprints at approximately 4:00 a.m. on March 25, 2008, and Detectives

14  Hodge, Laird, Lauer and others waited for additional officers to arrive to execute the

15  warrant.  Dkt. # 88-8 at 8, 19 (Ex. H to Fiorito Decl., Laird Depo. at 67:8-12, 145:4-

16  146:4).  The morning of March 25, 2008, as Mr. Fontana approached his truck, he saw at

17  least four cars drive up pretty quickly, one of which was an unmarked car.  Dkt. # 94

18  (Fontana Decl.) ¶ 11. Detective Hodge got out of the unmarked car and pointed his gun

19  directly at Mr. Fontana.  Dkt. # 94 (Fontana Decl.) ¶ 11; Dkt. # 89-2 at 4-5 (Ex. N to

20  Fiorito Decl., Fontana Depo. at 88:22-89:23, 91:6-16).  There is no evidence that either

21  Detective Laird or Detective Lauer had their firearms out.  Nevertheless, despite the fact

22  that Mr. Fontana was fully compliant[25] and informed Detective Hodge that he needed

23  time to get to the ground because of his bad back and shoulders, Detective Hodge shoved

24  his foot into Fontana's back and twisted his arms, while Lauer did an "arm bar

25  _____

26

27          [25] Whether plaintiff was compliant is a material fact in dispute.  The court has taken
        plaintiff's version of the events as true, as it must on summary judgment.

ORDER- 31

takedown"[26] to take Fontana to the ground.  *Id.*; Dkt. # 88-6 at 13 (Ex. F to Fiorito Decl.,

Hodge Depo. at 116:18-25); Dkt. #89-2 at 5-6 (Ex. N to Fiorito Decl. at 92:24-94:2); Dkt.

# 88-11 at 12 (Ex. K to Fiorito Decl., Lauer Depo. at 75:10-18).  Detective Lauer was

actively involved and physically assisted in the use of force against Fontana.

Accordingly, Detective Lauer was not a mere bystander.  Viewing the evidence in the

light most favorable to plaintiff, the court finds that a jury could reasonably find that

Detective Lauer was an integral participant in the constitutional violation.

        In contrast, Detective Laird was standing nearby to assist if needed.  He did not

physically assist because Detectives Hodge and Lauer had everything under control.  Dkt.

# 88-8 at 8-10 (Ex. H to Fiorito Decl., Laird Depo. at 66:23-67:3, 71:5-73:10).  Nor is

there any evidence of a conversation about the use or amount of force that would be

employed, or any other evidence that Detective Laird participated in the use of force in

some meaningful way.  Under these facts, Detective Laird was a mere bystander.  *See*

*Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009) ("While the 'integral

participant' rule may extend liability beyond simply those officers who provide 'armed

backup,' it is clear that an officer who waits in the front yard interviewing a witness and

does not participate in the unconstitutional search in any fashion cannot be held liable

under *Chuman*.").  Accordingly, the court DISMISSES the excessive use of force claim

against Detective Laird.

        Having concluded that plaintiff can make out a constitutional violation for

excessive use of force against Detectives Hodge and Lauer, the court must determine

whether the right was clearly established.  "The law of this circuit regarding excessive

force as it relates to the use by police officers of drawn firearms was established by the en

banc court in *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc)."

---

        [26] An "arm bar takedown" is a technique for physically taking people down to the ground.
Dkt. # 88-6 at 14 (Ex. F to Fiorito Decl., Hodge Depo. at 117:1-16).

1   *Hopkins*, 573 F.3d at 776.  The *Robinson* court recognized the "general principle that
2   pointing a gun to the head of an apparently unarmed suspect during an investigation can
3   be a violation of the Fourth Amendment, especially where the individual poses no
4   particular danger."  *Robinson*, 278 F.3d at 1015; *see also Baldwin*, 418 F.3d at 970
5   (pointing weapons and pushing plaintiff could constitute excessive force).  Additionally,
6   with respect to the take down, the court "need look no further than *Graham*'s holding that
7   force is only justified when there is a need for force."  *Blankenhorn*, 485 F.3d at 481.
8   This clear principle coupled with *Robinson* would have put a prudent officer on notice
9   that an officer pointing a gun directly at plaintiff and shoving him while another officer
10  took him to the ground, without first attempting a less violent means of executing the
11  search warrant on a person of interest who was, by his account, attempting to comply
12  with the demands, not attempting to flee and not a threat to officer safety, was a violation
13  of that person's Fourth Amendment rights.

14      Accordingly, Detectives Hodge and Lauer are not entitled to qualified immunity
15  on plaintiff's excessive use of force claim.

16  **5.  Eighth Amendment Violation for Denial of Medical Treatment**

17      "Claims of failure to provide care for serious medical needs, when brought by a
18  detainee . . . who has been neither charged nor convicted of a crime, are analyzed under
19  the substantive due process clause of the Fourteenth Amendment."  *Lolli v. County of*
20  *Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003).  Since plaintiff was not charged with and
21  convicted of a crime, he does not have an Eighth Amendment claim.

22      Nevertheless, the Due Process Clause of the Fourteenth Amendment requires the
23  police to provide medical care to persons who have been injured while being
24  apprehended by the police.  *City of Revere v. Mass. Gen. Hospital*, 463 U.S. 239, 244
25  (1983).  The due process rights of a person detained by the police "are at least as great as
26  the Eighth Amendment protections available to a convicted prisoner."  *Id.*  Accordingly,
27  courts apply the same deliberate indifference standard in both cases. *Simmons v. Navajo*

*County*, 609 F.3d 1011, 1017 (9th Cir. 2010).  Plaintiff must show that the official was
(1) subjectively aware of the serious medical need and (2) failed adequately to respond.
*Id.* at 1018.  In order to show that the medical need was "serious," plaintiff must show
that "failure to treat [the detainee's] condition could result in further significant injury or
the 'unnecessary and wanton infliction of pain.'"  *Jett v. Penner*, 439 F.3d 1091, 1096
(9th Cir. 2006).  The second prong requires a showing of a purposeful act or failure to
respond to a prisoner's pain or possible medical need and harm caused by the
indifference.  *Id.*  Indifference may appear when prison officials deny, delay or
intentionally interfere with medical treatment, or it may be shown by the way in which
prison physicians provide medical care.  *Id.*  However, inadvertent or negligent failure to
provide adequate medical care alone does not state a claim.  *Id.*  Additionally, plaintiff
must demonstrate that defendants' actions were both an actual and proximate cause of his
injuries.  *Lemire v. Cal. Dept. of Corrections & Rehab.*, __ F.3d __, 2013 WL 4007558,
*7 (9th Cir. Aug. 7, 2013) (citing *Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010),
*vacated by* __ U.S. __, 131 S.Ct. 1812 (2011), *reinstated in relevant part by* 658 F.3d 897
(9th Cir. 2011)).

Plaintiff argues that Detectives Deyo and Laird led him to believe that if he did
what they wanted him to do, he would get medical attention for his shoulder and back
pain.  Dkt. # 87 at 31.  Mr. Fontana told Detectives Deyo and Laird that his right
shoulder hurt.[27]  Dkt. # 94 (Fontana Decl.) ¶ 16; Dkt. # 89-2 at 8 (Ex. N to Fiorito Decl.,
Fontana Depo. at 102:7-103:6, 103:24-105:3).  However, plaintiff has not presented the
court with any evidence that defendants' failure to provide medical attention was the
actual and proximate cause of his injuries.  Accordingly, this claim is DISMISSED.

---

[27] The court notes that during Mr. Fontana's deposition, he testified that the first time he
mentioned his injury was to Detectives Deyo and Laird at the detention center.  Dkt. # 89-2 at 8
(Ex. N to Fiorito Decl., Fontana Depo. at 103:24-104:20.

**6.  Municipal Liability**

     i.    <u>Policy of Arrest without Probable Cause</u>

     Plaintiff argues that Federal Way endorses a policy or custom that permits, authorizes, directs and encourages its officers to arrest individuals without probable cause to execute a search warrant to seize that individual's DNA and fingerprints.  Dkt. # 87 at 35.

     A municipality or other local government may be liable under 42 U.S.C. § 1983 if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.  *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978)).  However, local governments are responsible only for their own illegal acts under section 1983.  *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).  Local governments are not vicariously liable under section 1983 for actions of their employees.  *Id.*  "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  *Id.*  "There are three ways to show a policy or custom of a municipality:  (1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policy making authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."[28]  *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (internal quotations omitted).  Whether an official is a final policymaker is a question governed by

---

     [28] Plaintiff appears only to invoke the first and third theories of liability.  Dkt. # 87 at 33 (longstanding practice & ratification by policymaker).

1   state law, although such a determination may turn on particular facts.[29]  *See Bouman v.*
2   *Block*, 940 F.2d 1211, 1231 (9th Cir. 1991).

3                       1.  *Longstanding Practice or Custom*

4        To prevail on this theory, plaintiff must prove "the existence of a widespread

5   practice that … is so permanent and well settled as to constitute a 'custom or usage' with

6   the force of the law."  *Gillete v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) (quoting

7   *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

8        The parties have not directed the court to any specific policy or procedure

9   regarding the execution of a search warrant for seizure of a person's DNA and

10  fingerprints, and the court has found none.  *See* Dkt. # 91-5 at 5 (Ex. ee to Fiorito Decl.,

11  Arbuthnot Depo. at 36:16-22); Dkt. # 92-6 at 11 (Ex. nn to Fiorito Decl., Wilson Depo. at

12  73:7-17).  Detective Laird testified that under the circumstances of serving a search

13  warrant for DNA and fingerprints, there is never a circumstance where he would serve

14  the warrant and not handcuff the individual, and that once the individual is transported to

15  the detention center, he is handcuffed and shackled to the bench.  Dkt. # 88-8 at 11 (Ex.

16  H to Fiorito Decl., Laird Depo. at 82:4-83:5).  Chief of Police Brian Wilson testified that

17  the search warrant to seize Fontana's DNA and/or fingerprints authorized the police to

18  "have the ability to detain and arrest him to obtain the evidence."  Dkt. # 92-6 at 9-11

19  (Ex. nn to Fiorito Decl., Wilson Depo. at 66:19-67:8, 71:7-24, 72:23-73:6).  Additionally,

20  Officer Grossnickle, who was the lieutenant in charge of supervising the Britt homicide,

21  has testified that "[a]ll of the detectives' activities during this homicide investigation

22  were proper and consistent with Federal Way training, policy, and procedures."  Dkt. #

23  91-4 at 3 (Ex. dd to Fiorito Decl., Grossnickle Decl. ¶¶ 3, 6).  The court notes that

24  _____

25      [29] Defendants have not disputed that the Chief of Police has final policymaking authority.
26  Dkt. # 81-1 at 35-36; # 96 at 11-12.  Rather, defendants argue that the Chief of Police rendering
    "an opinion on a warrant he had not seen before his deposition cannot be deemed to be
27  ratification under § 1983."  Dkt. # 96 at 12.

1    Commanders Arbuthnot and Neal have testified that the process of executing a search

2    warrant for DNA and/or fingerprinting would involve detaining the individual and

3    transporting him to the station to execute the warrant.  Dkt. # 91-5 at 5 (Ex. ee to Fiorito

4    Decl., Arbuthnot Depo. at 35:2-25) (DNA); Dkt. # 91-6 at 10-11 (Ex. ff to Fiorito Decl.,

5    Neal Depo. at 96:24-97:1) (evidentiary samples).  However, the officers had the ability to

6    take DNA swabs in the field, and did so for several individuals. *See* Dkt. ## 64 at 11 (Ex.

7    A to Lauer Decl.); 88-6 at 2 (Ex. F to Fiorito Decl., Hodge Depo. at 36:10-12).

8    Nevertheless, the undisputed evidence demonstrates that the detectives did not have the

9    capability to take fingerprints of an individual in the field.[30]  *See* Dkt. # 88-6 at 2 (Ex. F

10   to Fiorito Decl., Hodge Depo. at 36:13-37:2).  Additionally, although officers had the

11   capability of taking DNA swabs in the field, there is no evidence that officers took DNA

12   swabs in the field pursuant to a search warrant.  Rather, the evidence demonstrates that

13   the DNA swabs in the field occurred pursuant to a request and voluntary compliance.

14         The court finds that this evidence is insufficient to establish a longstanding

15   practice or custom of arrest without probable cause in executing a search warrant for

16   DNA and fingerprints.  Plaintiff has not presented any evidence of past constitutional

17   violations with respect to executing a search warrant for DNA and/or fingerprinting.  The

18   settlement agreements provided, although inadmissible to prove liability, are admissible

19   to demonstrate knowledge by the City of other alleged constitutional violations.  Fed. R.

20   Evid. 408.  However, none of those lawsuits involved executing a search warrant for

21   DNA and/or fingerprints.  Additionally, the procedure described by Commanders

22   Arbuthnot and Neal does not in and of itself provide evidence of an unconstitutional

23   _____

24         [30] The court notes that there appears to have been a Crime Scene Response Unit present
     when the officers executed the search warrant.  Dkt. # 88-1 at 2 (Ex. A to Fiorito Decl.).  The
25   court finds it difficult to believe that a vehicle the size of an RV camper that is designated as the
     Crime Scene Response Unit would not have the proper technology or tools to take fingerprints in
26   the field.  Nevertheless, there is no evidence to suggest that this Crime Scene Response Unit had
     such technology.
27

1   policy to arrest without probable cause.  As indicated above, the Supreme Court has

2   indicated that under limited circumstances, such a procedure may be authorized under the

3   Fourth Amendment.  *Hayes*, 470 U.S. at 817.  The court believes that the procedures

4   described by Arbuthnot and Neal, if accomplished in a reasonable manner and within a

5   reasonable timeframe, would be constitutional under *Hayes*.

6          Accordingly, plaintiff has not demonstrated a genuine issue of material fact with

7   respect to a longstanding practice or custom of arrest without probable cause in executing

8   a search warrant for DNA and fingerprints.

9                  *2.   Ratification by Policymaker*

10         Plaintiff argues that Chief Wilson ratified a subordinate's unconstitutional

11  decision and the basis for it.  Dkt. # 87 at 33.

12         The Supreme Court has held that municipal liability may be imposed for a single

13  decision by a municipal policymaker under appropriate circumstances.  *Pembaur*, 475

14  U.S. at 480.  If the decision to adopt a particular course of action is properly made by a

15  government's authorized decisionmakers, it represents an act of official government

16  "policy."  *Id.* at 481 (plurality opinion).  "More importantly, where action is directed by

17  those who establish government policy, the municipality is equally responsible whether

18  that action is to be taken only once or to be taken repeatedly."  *Id.*  However, the plurality

19  of *Pembaur* held that municipal liability attaches only where the decisionmaker possesses

20  final authority to establish municipal policy with respect to the action ordered.  *Id.*  The

21  plurality of *Pembaur* also held that municipal liability will only attach where "a

22  deliberate choice to follow a course of action is made from among various alternatives by

23  the official or officials responsible for establishing final policy with respect to the subject

24  matter in question."  *Id.* at 483 (plurality opinion); *see also Oklahoma City v. Tuttle*, 471

25  U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not

26  sufficient to impose liability under *Monell*, unless proof of the incident includes proof

27

1   that it was caused by an existing, unconstitutional municipal policy, which policy can be

2   attributed to a municipal policymaker.") (plurality opinion).

3          The only evidence plaintiff provides for "ratification" is Chief Wilson's testimony

4   at his deposition in this case.  At his deposition, Chief Wilson testified several times that

5   a search warrant to seize DNA and fingerprints allows the police "to detain and arrest"

6   the individual "to obtain the evidence [that is] identified in the search warrant."  Dkt. #

7   92-6 67 at 9-11 (Ex. nn to Fiorito Decl., Wilson Depo. at 66:25-67:8, 70:22-71:24, 72:23-

8   73:6).  The court finds that Chief Wilson's comments during his deposition in this case is

9   not affirmative or deliberate conduct that may be said to have ratified the conduct of

10  other officers.

11         Accordingly, plaintiff has not demonstrated an issue of material fact with respect

12  to municipal liability on the basis of an alleged policy of arrest without probable cause.

13     ii.    Failure to Train

14         Plaintiff also argues that Federal Way's failure to train its officers or failure to

15  execute proper supervisory authority over its officers resulted in violation of plaintiff's

16  constitutional rights.  Dkt. # 87 at 35-36.  Specifically, plaintiff argues that Federal Way

17  provided no training regarding serving search warrants to seize DNA or fingerprints, and

18  provided inadequate training regarding the distinction between a detention and an arrest.

19  *Id.* at 36.

20         "In limited circumstances, a local government's decision not to train certain

21  employees about their legal duty to avoid violating citizens' rights may rise to the level of

22  official government policy."  *Connick*, 131 S.Ct. at 1359.  A local government's failure to

23  train its employees in a relevant respect must amount to deliberate indifference to the

24  rights of persons with whom the untrained employees come into contact to be properly

25  considered a policy or custom that is actionable under section 1983.  *Id.*

26

27

ORDER- 39

1    There appears to be several types of general training available to Federal Way

2 Officers, including particular training from the prosecutor's office on legal updates[31] with

3 respect to search and seizure law, on-the-job training, lesson plans conducted or

4 sponsored by Federal Way, and outside training.  Dkt. # 91-5 at 6 (Ex. ee to Fiorito Decl.,

5 Arbuthnot Depo. at 53:17-54:11, 56:1-17) (on-the-job training); # 91-6 at 4, 5 (Ex. ff to

6 Fiorito Decl., Neal Depo. at 27:1-28:18, 29:2-30:2) (lesson plans conducted or sponsored

7 by Federal Way, outside training, and legal update training from prosecutors).  Officers

8 also receive a policy and procedure manual when it is revised every three years, and are

9 responsible to ensure they are aware of the contents, but they do not receive any training

10 with respect to the manual.  Dkt. # 91-6 at 3 (Ex. ff to Fiorito Decl., Neal Depo. at 22:20-

11 23:12).

12    The only evidence in the record for training with respect to *executing* a search

13 warrant appears to be on-the-job training.  Several officers testified that training with

14 respect to execution of a search warrant is on-the-job training that is accomplished

15 through the experience of other officers and supervisors at the scene.  Dkt. # 88-3 at 7

16 (Ex. C to Fiorito Decl., Calhoun Depo. at 79:21-80:7); # 91-5 at 3 (Ex. ee to Fiorito

17 Decl., Arbuthnot Depo. at 24:7-19).  With respect to the on-the-job trainings, the

18 supervising officers are responsible for identifying any shortcomings, but there are no

19 final reviews done of the officer.  Dkt. # 91-5 at 6 (Ex. ee to Fiorito Decl., Arbuthnot

20 Depo. at 53:17-54:11).  Additionally, defendants have not directed the court to, and the

21 court has not found, any evidence that the City has training with respect to executing a

22 search warrant for DNA or fingerprinting.  *See* Dkt. # 92-6 at 11 (Ex. nn to Fiorito Decl.,

23

24

_____

25    [31] Defendants have not provided the court with the content of any of these legal update
26 trainings.  Accordingly, the court is unable to determine one way or another whether the specific
   training by the prosecutor's office on search and seizure law is adequate or even whether any of
27 the updates covered search warrants for DNA and fingerprints.

1    Wilson Depo. at 73:7-17).  Additionally, there is no evidence from which the court could

2    conclude that the on-the-job trainings were adequate.

3            Indeed, Detective Lauer believed at the time that the search warrant was an arrest

4    warrant.  Dkt. # 88-11 at 9 (Ex. K to Fiorito Decl., Lauer Depo. at 63:25-64:6).

5    Additionally, Detective Hodge has testified that if it is a felony case, regardless of

6    whether it involves detaining or arresting a suspect or person of interest, he treats

7    everyone the same.  Dkt. # 88-6 at 8 (Ex. F to Fiorito Decl., Hodge Depo. at 66:14-

8    67:20).  The fact that Detective Hodge believed Mr. Fontana was a suspect, as opposed to

9    a person of interest, and that Detective Lauer believed they had an arrest warrant suggests

10   inadequate training and/or supervision.  Additionally, the fact that several officers believe

11   that "arrest" means charging an individual with a crime indicates that these officers were

12   not properly trained on the legal significance of an arrest versus a detention under the

13   Fourth Amendment.  *See* Dkt. # 88-6 at 11 (Ex. F to Fiorito Decl., Hodge Depo. 97:4-13,

14   98:4-9); Dkt. # 88-11 at 9 (Ex. K to Fiorito Decl., Lauer Depo. at 61:23-62:7); *see also*

15   Dkt. # 91-3 at 2 (Ex. cc to Fiorito Decl., Grossnickle Depo. at 44:20-25 (testifying that

16   Fontana was "in custody" not under "arrest" because they had "taken his freedom away

17   to leave")).  *Contrast Hodari*, 499 U.S. at 627-28 (seizure occurs "within the meaning of

18   the Fourth Amendment only if, in view of all the circumstances surrounding the incident,

19   a reasonable person would have believed that he was not free to leave."); *Ganwich*, 319

20   F.3d at 1122 ("A seizure becomes unlawful when it is 'more intrusive than necessary[,]'"

21   and the "scope of a detention 'must be carefully tailored to its underlying justification.'")

22   (quoting *Royer*, 460 U.S. at 504, 500)); *Stevens v. Rose*, 298 F.3d 880, 883 (9th Cir.

23   2002) (arrest occurs if a reasonable person would conclude that he was not free to leave

24   based on the totality of the circumstances, including the intrusiveness of the stop and

25   whether the degree of intrusion was justified).

26           The court believes that plaintiff has raised a triable issue of material fact with

27   respect to whether the on-the-job training, legal updates and any other purported training,

1    the contents of which are not before this court, were adequate with respect to executing a

2    search warrant generally, and, in particular, executing a search warrant for DNA and

3    fingerprints.

4         Nevertheless, plaintiff must demonstrate that the inadequacy of training and/or

5    supervision amounted to deliberate indifference to the rights of persons with whom the

6    employee comes into contact. *Tanner v. Heise*, 879 F.2d 572, 582-83 (9th Cir. 1989)

7    (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  Deliberate indifference is a

8    stringent standard of fault, requiring proof that a municipal actor disregarded a known or

9    obvious consequence of his action. *Connick*, 131 S.Ct. at 1360.  A city's policy of

10   inaction in light of notice that its program will cause constitutional violations is the

11   functional equivalent of a decision by the city itself to violate the Constitution. *Id.*  A

12   pattern of similar constitutional violations by untrained employees is ordinarily necessary

13   to demonstrate deliberate indifference for purposes of failure to train. *Id.*  A

14   policymaker's continued adherence to an approach that they know or should know has

15   failed to prevent tortious conduct by employees may establish the conscious disregard for

16   the consequences of their action standard. *Id.*  Without notice that a course of training is

17   deficient in a particular respect, decisionmakers can hardly be said to have deliberately

18   chosen a training program that will cause violations of constitutional rights. *Id.*

19        The only evidence plaintiff has provided are cases alleging unlawful detention at a

20   retail store, excessive use of force during felony stops of a vehicle, unlawful detention of

21   a driver without probable cause, and unlawful entry into a citizen's home and arrest

22   without probable cause. Dkt. # 87 at 38-39.  None of these cases involve drafting or

23   executing a search warrant for DNA or fingerprints.  Although the City is now on notice

24   that its training may be inadequate (at least when viewing the evidence before the court in

25   the light most favorable to plaintiff), there is no evidence before this court that indicates

26   that the City had notice of deficient training at the time of the incident.  Accordingly,

27   plaintiff has not demonstrated a genuine issue of material fact with respect to deliberate

1  indifference of the City for failure to train.  The court DISMISSES the failure to train

2  claim against the City as well.

3                          **IV.     CONCLUSION**

4          For all the foregoing reasons, the court GRANTS in part and DENIES in part the

5  motion for partial summary judgment.  The City of Federal Way is hereby DISMISSED.

6  Since the court has dismissed the City, the Clerk is DIRECTED to terminate defendants'

7  motion to bifurcate as MOOT.  Dkt. # 59. The Clerk is DIRECTED to schedule trial and

8  pre-trial deadlines.  Trial shall be scheduled for March 3, 2014.

9

10         Dated this 24th day of September, 2013.

11

12                          _____

13                          The Honorable Richard A. Jones
                            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27